UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MARILYN GAUDET,            )
                           )
         *Plaintiff*       )
                           )
v.                         )   No. 1:10-cv-506-JAW
                           )
MICHAEL J. ASTRUE,         )
**Commissioner of Social Security,**  )
                           )
         *Defendant*       )

### *REPORT AND RECOMMENDED DECISION*[1]

This Social Security Disability ("SSD") appeal raises the question of whether the commissioner supportably found the plaintiff capable of returning to past relevant work as an auto parts assembler. The plaintiff seeks reversal and remand for further proceedings on the bases that the administrative law judge (i) failed to properly assess the findings of a KEY functional assessment conducted by an occupational therapist and adopted as a source opinion by a treating physician, Charles Burger, M.D., (ii) failed at Step 2 to properly evaluate the plaintiff's complaint of a tremor of the hands, and (iii) was inconsistent at Steps 2 and 4 in evaluating her right arm and elbow condition and failed to address the finding of an independent medical examiner, Philip R. Kimball, M.D., that she could not perform repetitive work because of that injury. *See* Plaintiff's Itemized Statement of Specific Errors (Corrected) ("Statement of Errors")

---

[1] This action is properly brought under 42 U.S.C. § 405(g). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on September 15, 2011, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

1

(Docket No. 13) at 4-12. On the basis of the third point of error, I recommend that the decision of the commissioner be vacated and the case remanded for further proceedings.

The decision in question was issued following an order by the Decision Review Board vacating a prior decision and remanding the matter for further proceedings. *See* Record at 127-29. The order directed the administrative law judge, *inter alia*, to offer the plaintiff an opportunity for a new hearing, *see id*. at 129, and he did so, presiding at a hearing at which medical expert Peter Webber, M.D., mental health expert Charles Tingley, Ph.D., and vocational expert Peter Mazzaro testified, *see id*. at 43. Post-remand, pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 405.101 (incorporating 20 C.F.R. § 404.1520); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff had severe impairments of left shoulder impingement, major depression, and anxiety disorder, Finding 3, Record at 10; that she retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), but was unable to lift overhead with her left upper extremity or constantly finger with her right upper extremity, and was able to perform unskilled work, interact appropriately with co-workers and supervisors, and interact occasionally with the public, Finding 5, *id*. at 12; that she was capable of performing past relevant work as an auto parts assembler, which did not require the performance of work-related activities precluded by her RFC, Finding 6, *id*. at 18; and that she, therefore, was not disabled at any time from May 21, 2007, her alleged date of onset of disability, through August 9, 2010, the date of the decision, Finding 7, *id*. at 19.[2] The Decision Review Board selected the decision for review but failed to act within 90 days, *id*. at 1-

---

[2] The plaintiff is insured for purposes of SSD benefits through December 31, 2012. *See* Finding 1, Record at 10.

3, making the decision the final determination of the commissioner, 20 C.F.R. § 405.420(a)(2); *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. § 405(g); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 4 of the sequential evaluation process, at which stage the claimant bears the burden of proving inability to return to past relevant work. 20 C.F.R. § 405.101 (incorporating 20 C.F.R. § 404.1520(f)); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). At this step, the commissioner must make findings of the plaintiff's RFC and the physical and mental demands of past work and determine whether the plaintiff's RFC would permit performance of that work. 20 C.F.R. § 405.101 (incorporating 20 C.F.R. § 404.1520(f)); Social Security Ruling 82-62, reprinted in *West's Social Security Reporting Service* Rulings 1975-1982 ("SSR 82-62"), at 813.

The plaintiff's statement of errors also implicates Step 2 of the sequential evaluation process. Although a claimant bears the burden of proof at Step 2, it is a *de minimis* burden, designed to do no more than screen out groundless claims. *McDonald v. Secretary of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986). When a claimant produces evidence of an impairment, the commissioner may make a determination of non-disability at Step 2 only when the medical evidence "establishes only a slight abnormality or [a] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work

3

even if the individual's age, education, or work experience were specifically considered." *Id.* (quoting Social Security Ruling 85-28).

## I. Discussion

### A. Winning Point of Error: Treatment of Right Elbow Condition

I first discuss the plaintiff's third point of error, on the basis of which I recommend reversal and remand. The plaintiff complains of inconsistencies in the administrative law judge's handling of her right arm and elbow condition, stating that he found the condition nonsevere at Step 2 but nonetheless assessed restrictions flowing therefrom at Step 4, and he purported to give the opinion of Dr. Kimball great weight but failed to address Dr. Kimball's finding that the plaintiff could not perform repetitive work because of her elbow injury. *See* Statement of Errors at 9-12. The administrative law judge's handling of this impairment is indeed flawed.

Dr. Kimball assessed the plaintiff as suffering, *inter alia*, from strain/overuse of the right forearm muscles. *See* Record at 604. He stated, in relevant part:

> Examination of her right upper extremity indicates sensitivity to light skin touch over the medial elbow in the adipose tissue. However, there is a negative Tinel at the cubital tunnel, non-tender over the medial epicondyle, and stressing the flexor pronator group does not activate severe pain at this level. She is tender along the extensor supinator group of muscles, but non-tender at the epicondyle. She describes soreness and is also tender proximal to the lateral epicondyle along the lateral biceps and over the brachioradialis origin. Elbow motion is normal, as is wrist and hand motion.

*Id*. at 609. He further stated:

> There is a <u>pre-existing element</u> in her right elbow of having sustained a contusion in the medial aspect to her "funny bone." She has no evidence of cubital tunnel syndrome or medial epicondylitis at this time. Her lateral forearm pain more likely than not is overuse with slight deconditioning at her work, packing boxes or assembling the tie rods, which is her usual work.
>
> ∗∗∗
>
> I see no indication to treat her right forearm at this time except by general body conditioning.

> Her work capacity is light with the avoidance of repetitive activity of the right upper extremity currently, and overhead activity with her left.
>
> ***
>
> The prognosis is guarded from performing repetitive work with her right upper extremity. . . . It is her right upper extremity that may, in the long term, limit her.

*Id*. at 610-11 (underscore in original).

The administrative law judge relied in part on Dr. Kimball's finding that there was no indication for treatment of the plaintiff's right arm at that time in deeming the right arm/elbow condition nonsevere. *See id*. at 11. Yet, contradictorily, he stated that he gave Dr. Kimball's work capacity opinion, including the need for the avoidance of repetitive activity of the right upper extremity, great weight, explaining that Dr. Kimball was an orthopedic specialist with expertise in the evaluation of disability and that his opinion was supported by his own examination findings and consistent with the evidence as a whole. *See id*. at 16.

At Step 4, the administrative law judge assessed a restriction against constant fingering with the right upper extremity, *see* Finding 5, *id*. at 12, that may have been intended to reflect Dr. Kimball's right upper extremity limitation, although no rationale is given for its inclusion, *see id*. at 12-18. At hearing, he asked vocational expert Mazzaro to assume a hypothetical individual "capable of light work, no overheard work on the left, no constant fingering, handling on the right, and capable of unskilled work[.]" *Id*. at 104. Mazzaro stated that such a person could perform the job of auto parts assembler, which requires frequent, but not constant, handling, reaching, and fingering. *See id*. at 104-105; *see also, e.g.*, Dictionary of Occupational Titles (U.S. Dep't of Labor, 4th ed. rev. 1991) ("DOT") § 706.684-022.

As the plaintiff's counsel observed at oral argument, this court has held that there is an ambiguity as to how the term "repetitive" correlates with terms used in the DOT, notably

5

"constant" and "frequent." *See, e.g., Dandreo v. Astrue*, Civil No. 09-347-P-H, 2010 WL 2076090, at *4-*5 (D. Me. May 20, 2010) (rec. dec., *aff'd* June 9, 2010); *Perham v. Barnhart*, No. 03-240-P-S, 2004 WL 1529287, at *3 (D. Me. June 24, 2004) (rec. dec., *aff'd* July 13, 2004). This court has held that, absent clarification of the meaning of the term "repetitive," the commissioner cannot rely on the testimony of a vocational expert to carry his Step 5 burden that a claimant can perform work existing in significant numbers in the national economy. *See Dandreo*, 2010 WL 2076090, at *4-*5. At oral argument, the plaintiff's counsel contended that the fact that the instant case ended at Step 4 makes no difference, citing *Arocho v. Secretary of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982), for the proposition that responses of vocational experts are relevant only to the extent offered in response to hypothetical questions that correspond to the medical evidence of record and that, "[t]o guarantee that correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions."

In response to this argument, counsel for the commissioner conceded that the administrative law judge had erred in adopting restrictions, both in his official decision and as posited to the vocational expert at hearing, that failed to sufficiently address the opinion of Dr. Kimball that the plaintiff had to avoid repetitive work with her right upper extremity. However, he argued that the error was harmless because Dr. Webber purportedly indicated his agreement that Dr. Kimball's restriction against repetitive use of the right upper extremity translated to a restriction against constant use. He cited a portion of the hearing transcript reflecting the following colloquy between the administrative law judge and Dr. Webber:

> Q    And since the opinion at Exhibit 18-F [the report of Dr. Kimball], which was from October 2007, is there any significant evidence that might

6

> contradict the conclusion that the [plaintiff] [would] be capable of light work with significant limitations with her right elbow – no overhead use of the left, and no constant on the right. Is there any evidence to contradict that?
>
> A   I don't think there's much evidence since Exhibit 18[.]

Record at 90-91. The plaintiff's counsel disputed that this exchange fairly can be characterized as resolving the issue. I agree. As the plaintiff's counsel noted, the administrative law judge did not pointedly ask Dr. Webber for his opinion as to whether the restriction against repetitive use equated to a restriction against constant *versus* frequent use. *See id*. From all that appears, Dr. Webber was not focused on the correctness of the administrative law judge's interpretation and, hence, cannot fairly have been said to have endorsed it. *See id*.

This leaves the record devoid of expert clarification, whether by Dr. Webber, Dr. Kimball, or the vocational expert, of how the term "repetitive" correlates with the terms used in the DOT. The error is not harmless: to the extent that the term means "frequent" rather than "constant," the plaintiff would be unable to perform the job of auto parts assembler, which requires frequent handling, reaching, and fingering. *See* DOT § 706.684-022.

Reversal and remand accordingly are required for proper consideration of Dr. Kimball's restriction against repetitive use of the right upper extremity.

### B. Remaining Points of Error

#### 1. KEY Functional Assessment

The Record contains two copies of a KEY functional assessment completed at the request of Dr. Burger on April 23, 2008, by Tammy A. Pellegrino, OTR/L, assessment specialist: a stand-alone copy, *see* Record at 384-91, and a copy appended to an RFC opinion by Dr. Burger dated April 13, 2010, *see id*. at 640-51. In a cover letter to Dr. Burger dated April 24, 2008, Pellegrino noted:

7

> This is identified to be a Valid representation of the present physical capabilities of [the plaintiff] based upon consistencies and inconsistencies when interfacing grip dynamometer graphing, resistance dynamometer graphing, heart rate variations, weights achieved, and selectivity of pain reports and pain behaviors. The [plaintiff] is demonstrating full effort. The results represent the current capability level of the [plaintiff].
>
> Please note, the [plaintiff] demonstrated significant difficulty with fine motor tasks due to tremors. It was also noted the tremors increased with fatigue. There is also potential that either the [plaintiff] is significantly deconditioned or she is overworking as evidenced by excessively high heart rates. This may impact the safety and consistency of her performance.

*Id*. at 384.

Pellegrino deemed the plaintiff, *inter alia*, capable of working four to five hours in a workday, sitting for four hours with breaks, standing for three to four hours with breaks, walking for two to three hours with breaks, lifting between 10.4 and 12.6 pounds occasionally, and carrying 8.6 pounds occasionally with her right hand and 6.4 pounds occasionally with her left hand. *See id*. at 385.

Dr. Burger found the plaintiff, *inter alia*, capable of occasionally and frequently lifting/carrying 10 pounds, limited in pushing and/or pulling with her upper extremities, and limited to only two-and-a-half hours per day in performing any of the following: reaching, handling, fingering, or feeling. *See id*. at 640-42. He assessed no limitations on her ability to stand/walk and checked a box indicating that her ability to sit was not affected by her impairments, although she needed to periodically alternate between sitting and standing to relieve pain or discomfort. *See id*. at 640-41.

The administrative law judge accorded little weight to either the KEY functional assessment or Dr. Burger's RFC opinion. *See id*. at 17. He explained: "While Dr. Burger is a treating source, his opinion is not supported by and is out of proportion with the objective findings noted in his own treatment records. . . . Ms. Pellegrino only saw the [plaintiff] on one

8

occasion, and her conclusion is not consistent with the minimal objective findings of record, the minimal treatment required, and the [plaintiff's] own wide ranging activities of daily living." *Id*.

The plaintiff argues that:

1. The administrative law judge failed to appreciate that the functional assessment was conducted at the request of a treating source, Dr. Burger, who adopted it as his own source opinion. *See* Statement of Errors at 4-6.

2. The reason given for according little weight to the Burger RFC opinion, that it was not consistent with Dr. Burger's treating notes, was not a "good" reason for its rejection given that Dr. Burger relied on the objective assessment by Pellegrino to determine the plaintiff's RFC. *See id*. at 5-6; *see also, e.g*., 20 C.F.R. § 404.1527(d)(2) (commissioner must "always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [a claimant's] treating source's opinion").

The plaintiff adds that the administrative law judge "neglected to address the assessment on its own merits[,]" wrongly according it little weight on the bases that Pellegrino saw the plaintiff only once and that her findings were inconsistent with other evidence of record when (i) she needed to see the plaintiff only once to perform the assessment, and (ii) her findings were buttressed by the results of her own objective testing, which do not appear anywhere else of record. *See* Statement of Errors at 6-7.

For these propositions, the plaintiff relies in part on *Eshelman v. Astrue*, No. 06-107-B-W, 2007 WL 2021909 (D. Me. July 11, 2007) (rec. dec., *aff'd* July 31, 2007), *see id*. at 5-6, in which this court held that an administrative law judge failed to supply the requisite good reasons for the rejection of a functional assessment adopted by a treating source when, in stating that the assessment appeared to be predicated on the plaintiff's subjective complaints, he overlooked the

fact that it was buttressed by various objective indicators, such as graphing and pulse variations, *see Eshelman*, 2007 WL 2021909, at *3.

At oral argument, counsel for the commissioner asserted that the administrative law judge had indeed appreciated that Dr. Burger had adopted the KEY functional assessment, having cited to the version of that assessment appended to Dr. Burger's RFC opinion. *See* Record at 17, 640-51. He added that, even assuming *arguendo* that the administrative law judge did not appreciate that fact, he supportably evaluated both opinions and deemed them inconsistent with other record evidence. I agree that the administrative law judge's handling of the Burger opinion, as well as the Pellegrino assessment, passes muster. To the extent that Dr. Burger relied on the Pellegrino assessment, the administrative law judge's rationale for discounting that assessment applies equally to the Burger opinion.

*Eshelman* does not stand for the proposition that, because a KEY functional assessment is based on objective measurements, it trumps conflicting evidence of record. Rather, in that case, the court merely found that the reason given for discounting the assessment, that it was based on the plaintiff's subjective allegations, was not well-taken in circumstances in which the study indicated that it was based on objective measurements. *See Eshelman*, 2007 WL 2021909, at *3.

In this case, the administrative law judge cited inconsistencies between the Pellegrino assessment and other evidence of record in the form of minimal objective findings of record, minimal required treatment, and the plaintiff's own wide-ranging activities of daily living. *See* Record at 17. While, as the plaintiff's counsel observed at oral argument, the administrative law judge did not reconcile those inconsistencies, *see id.*, she implicitly referred to a prior detailed discussion of the record evidence addressing all three of those areas, *see id.* at 14-16. In so doing, she supplied adequate reason for rejecting the Burger RFC opinion and the KEY

functional assessment in favor of conflicting RFC evidence of record, including the Webber and Kimball opinions.

## 2. Step 2 Evaluation of Hand Tremors

The plaintiff finally faults the administrative law judge's conclusion at Step 2 that her hand tremors, diagnosed as "essential" tremors, were nonsevere. *See* Statement of Errors at 7-9.[3] I find no error.

The administrative law judge stated, in relevant part: "Although the [plaintiff] has been noted to have an essential tremor involving the upper extremities, she is able to crochet and use a computer, and the evidence of record fails to demonstrate any significant work related limitations are a result of this condition." Record at 10 (citations omitted).

The plaintiff argues that, in so finding, the administrative law judge overlooked (i) Pellegrino's statement that the plaintiff had demonstrated "significant difficulty with fine motor tasks[,]" which was consistent with the plaintiff's hearing testimony regarding the impact of her tremors, and (ii) Dr. Webber's testimony at hearing that tremors might affect close, very fine use of the hands. *See* Statement of Errors at 8-9.

However, in a different section of his decision pertaining to his RFC determination, the administrative law judge did address and give great weight to Dr. Webber's opinion, observing that Dr. Webber had noted, *inter alia*, "the minimal treatment received, and the lack of specific therapy or treatment for [the plaintiff's] tremors." Record at 15. In so stating, the administrative law judge alluded to the following testimony of Dr. Webber in response to a question regarding Pellegrino's findings with respect to the plaintiff's tremors:

---

[3] An "essential" tremor is "an action [tremor] of 4-8 Hz frequency that usually begins in early adult life and is limited to the upper limbs and head[.]" Stedman's Medical Dictionary 1867 (27th ed. 2000). An "action," or "intention," tremor is a tremor "that occurs during the performance of precise voluntary movements, caused by disorders of the cerebellum or its connections." *Id.*

11

> They were described as familial or essential tremor, and generally those are not to a degree where they would seriously interfere with a lot of activities. They may affect extremely close, very fine use of the hands, but, there again, I didn't see that there was any special therapy directed towards that problem, or the number of exhibits that there are, so I'm not sure that it's that much of a problem.

*Id*. at 93.

Indeed, the record discloses minimal mention of the plaintiff's tremors. The plaintiff first complained of hand tremors to a treating source, Franklin E. Bragg, M.D., on June 5, 2007. *See id*. at 448 ("You complain of hands shaking for the past 5 months. Your husband and others have noticed it."). On examination, Dr. Bragg found a tremor in the left hand with intention (movement) but not at rest, with no cogwheeling in either hand with reinforcement. *See id*. at 449. He recommended a thyroid test but did not prescribe any treatment for the condition. *See id*. In a followup visit on July 9, 2007, the plaintiff complained of continued tremor, more on the left hand than the right, but had not yet obtained the thyroid test. *See id*. at 445. Again, no treatment was prescribed. *See id*. at 446. I find no other complaints to a treating source of tremors, although Dr. Kimball, in his role as an independent medical examiner in the plaintiff's workers' compensation case, noted that, during his October 17, 2007, examination, she did "demonstrate a tremor involving both upper extremities as she reaches out forward which is not present at rest." *Id*. at 610. Dr. Burger did not include hand tremors among the diagnoses underpinning his April 13, 2010, opinion as to the plaintiff's RFC. *See id*. at 640-42.

In addition, two Disability Determination Services ("DDS") nonexamining consultants, J.H. Hall, M.D., and Robert Hayes, D.O., did not assess any functional limitations attributable to the plaintiff's hand tremors, despite noting that they had reviewed Dr. Bragg's 2007 office notes

pertaining to the same. *See id*. at 395, 399, 558, 560-61. The administrative law judge accorded those two opinions great weight. *See id*. at 17-18.[4]

Given the scant evidence of record of complaints arising from the hand tremors, the evidence that the plaintiff engaged in crocheting and computer use, the RFC opinions of Drs. Hall and Hayes, and Dr. Webber's testimony at hearing, the administrative law judge's finding of the nonseverity of that impairment is supported by substantial evidence.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **VACATED** and the case **REMANDED** for further proceedings consistent herewith.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 27th day of September, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[4] The plaintiff notes that, although Dr. Hall stated that he found no evidence of significant work-related limitations from the hand tremors, *see* Record at 395, he did not have the benefit of review of either Dr. Kimball's report or Pellegrino's KEY functional assessment, *see* Statement of Errors at 8 n.12. Nonetheless, Dr. Kimball did not describe any functional limitations arising from the hand tremors, *see* Record at 610-11, and I have concluded that the administrative law judge supportably gave little weight to the KEY functional assessment.